**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| MARILYN MULERO, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. |
| REYNALDO GUEVARA; GERI LYNN | ) | |
| YANOW, as Special Representative for the | ) | |
| Estate of ERNEST HALVORSEN; | ) | |
| STEPHEN GAWRYS; ANTHONY | ) | **JURY TRIAL DEMANDED** |
| RICCIO; ROBERT BIEBEL; and CITY | ) | |
| OF CHICAGO, a municipal | ) | |
| corporation, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

---

## COMPLAINT

---

Marilyn Mulero, by and through her attorneys, Romanucci & Blandin, LLC, and Hart McLaughlin & Eldridge, LLC, states as follows for her Complaint against Reynaldo Guevara; Geri Lynn Yanow, as Special Representative for the Estate of Ernest Halvorsen; Stephen Gawrys; Anthony Riccio; Robert Biebel; and the City of Chicago:

## <u>INTRODUCTION</u>

1.      Marilyn Mulero spent nearly 28 years incarcerated for a crime she did not commit. Mulero was only 21 years old when she was wrongfully incarcerated and ripped away from her two young sons. She was interrogated and tormented by two corrupt members of the Chicago Police Department, now-disgraced Detectives Reynaldo Guevara and Ernest Halvorsen. She lived through the pain, suffering, and utter horror of being in prison for nearly three decades. She was the first Latina in the history of Illinois to be sentenced to death and spent five years in isolation on death row. She

fought through the constant mental torture that her children, her young adulthood, and potentially her life were taken from her notwithstanding her innocence. She lived through the frustration that no matter how hard she fought and no matter how much she believed, the system failed her time and time again. And now, after surviving a level of torment that no innocent person deserves, she comes before this Court seeking justice.

2.    The profound atrocities Mulero suffered were a direct result of the egregious and purposeful misconduct of disgraced Chicago Police Detectives Reynaldo Guevara and Ernest Halvorsen. Consistent with their now well-known *modus operandi*, Guevara and Halvorsen concocted a false narrative targeting Mulero – an innocent person – and then engaged in a series of misconduct to fabricate evidence supporting that false narrative. Their misconduct against Mulero ran the gamut. They failed to provide her with access to a lawyer, used egregiously unconstitutional interrogation tactics, coerced a false confession from her through intimidation and psychological torture, manipulated and coerced purported witnesses into providing false statements, promised leniency to jailhouse informants in exchange for false testimony, and manipulated lineups and identifications. Worse yet, Guevara and Halvorsen, together with their co-conspirators, engaged in this conduct knowing that Mulero was innocent. This evil and injustice cannot be overstated.

3.    By way of background, on May 12, 1992, at approximately 12:15 a.m., Jacqueline Montanez shot and murdered two Latin Kings, Hector Reyes and Jimmy Cruz, in Humboldt Park. Shortly thereafter, Montanez confessed and bragged about the shootings to Yvette Rodriguez. Later that day, Rodriguez was arrested on drug possession charges and, hoping for leniency, told CPD detectives she had information about the murders. Rodriguez then told CPD that Montanez admitted to committing the murders and described exactly how they occurred. Rather than accepting that truth, Guevara and Halvorsen seized the opportunity to obtain additional arrests and convictions and, ultimately, framed Mulero for one of the murders Montanez committed.

4.      In doing so, Guevara, Halvorsen, and their co-conspirators subjected Mulero to extreme and unrelenting coercive interrogation tactics until she was psychologically broken and falsely confessed. Additionally, in furtherance of their conspiracy, Guevara, Halvorsen, and their co-conspirators coerced statements from purported witnesses and fabricated additional evidence against Mulero. Facing a myriad of coerced and fabricated evidence against her, Mulero believed that she had no choice but to plead guilty in the hopes of garnering sympathy and avoiding the death penalty. Tragically, she was sentenced to death anyway, until, several years later, her death sentence was reduced to life in prison.

5.      Following her conviction, Mulero filed a number of post-conviction petitions and appeals seeking to overturn her wrongful conviction, but unfortunately, none were granted. Then, on April 6, 2020, after investigations and civil lawsuits uncovered a flood of evidence that Guevara, Halvorsen and other Area Five detectives and supervisors had framed dozens of innocent individuals for crimes they did not commit, Governor Pritzker commuted Mulero's prison sentence. On April 8, 2020, she was finally released from prison.

6.      Thereafter, on August 9, 2022, Mulero's conviction was vacated by agreement with the Cook County State's Attorney's Office and all charges against her were dismissed.

7.      On April 25, 2023, The same office that once charged and convicted Mulero publicly acknowledged both her innocence, and that her wrongful conviction was caused by corruption within CPD, when the Cook County State's Attorney stated:

> *Marilyn Mulero went to prison for a crime which she didn't commit, as a young girl, serving the majority of her formative years there. A crime she didn't commit, in which she was wrongfully convicted based upon the evidence and the testimony of a corrupt police officer.*

8.      The City of Chicago must also be held to account for this grave injustice. As described in greater detail below, Mulero's wrongful conviction was not an isolated incident. She is one of *at least* 38 men and women exonerated after being convicted on murder charges due to the misconduct of

Detectives Guevara, Halvorsen, and other Area Five detectives and supervisors. These tragedies could not have occurred without CPD's widespread custom and practice of condoning police misconduct and failing to train, supervise, and discipline CPD members. As a result, Detectives Guevara, Halvorsen, and their co-conspirators believed they could engage in abusive, unethical, and unconstitutional behavior without consequence or repercussion, resulting in innocent people spending decades in prison for crimes they did not commit.

9.    In court proceedings since, Guevara has repeatedly plead the Fifth Amendment in response to questions about his and his fellow Area Five officers' misconduct. In the case of *Sierra v. Guevara, et al.*, 18-cv-03029 (N.D. Ill.), Guevara was asked specifically about Mulero's case and repeatedly invoked the Fifth Amendment, thereby raising the adverse inference that he did, in fact, frame Marilyn Mulero for murder.

> Q.    Did you frame Marilyn Mulero for the shooting deaths of Reyes and Cruz?
> A.    Invoke Fifth Amendment rights.
>
> Q.    You conspired with other Chicago police officers to frame Marilyn Mulero for the deaths of Reyes and Cruz, correct?
> A.    Invoke Fifth Amendment rights.
>
> Q.    Based on your investigation of the Cruz/Reyes homicide, you knew that Marilyn Mulero did not shoot Reyes and Cruz, correct?
> A.    Invoke Fifth Amendment rights.
>
> Q.    Based on your investigation, you learned that Jackie Montanez was, in fact, the person who shot and killed Reyes and Cruz, correct?
> A.    Invoke Fifth Amendment rights.
>
> Q.    Despite that knowledge, you fabricated evidence including falsifying police reports as part of the of the Cruz/Reyes homicide investigation, correct?
> A.    Invoke Fifth Amendment rights.

Q.   During the Cruz/Reyes homicide investigation, you manipulated witnesses to falsely select Marilyn Mulero from lineups, correct?

A.   Invoke Fifth Amendment rights.

Q.   You threatened to leave Marilyn Mulero with the Latin Kings to exact revenge for the murder of their fellow Latin Kings, Reyes and Cruz, correct?

A.   Invoke Fifth Amendment rights.

Q.   You drove Mulero to Latin King territory and threatened her in order to coerce her into giving a confession to the Cruz/Reyes homicide, correct?

A.   Invoke Fifth Amendment rights.

Q.   After driving Ms. Mulero around, you then interrogated her in the Cruz/Reyes homicide case, correct?

A.   Invoke Fifth Amendment rights.

Q.   During that interrogation, you threatened Mulero with the death penalty if she did not confess, correct?

A.   Invoke Fifth Amendment rights.

Q.   You threatened Marilyn Mulero that she would never see her kids again if she did not confess, correct?

A.   Invoke Fifth Amendment rights.

Q.   Ultimately, you extracted a false confession from Marilyn Mulero through improper pressure, threats and promises, correct?

A.   Invoke Fifth Amendment rights.

10.   Although Marilyn Mulero has finally regained her physical freedom, the injuries she suffered as a result of Defendants' misconduct are profound. She brings this lawsuit to seek both compensation for those injuries and to hold Defendants accountable for their evil, malicious, and unconstitutional misconduct.

## JURISDICTION AND VENUE

11.   This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 because this is an action arising under 42 U.S.C. § 1983.

5

12.     The Court has jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367(a) because those claims are so related to the claims providing the basis for federal subject matter jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

13.     The Court has personal jurisdiction over Defendants because at least some reside in the State of Illinois and because their conduct described herein occurred exclusively in Illinois.

14.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391 because Plaintiff's injury and damages occurred in the Northern District of Illinois, there are efendants who reside and conduct business in the Northern District of Illinois, and all events giving rise to this action occurred in the Northern District of Illinois.

## PARTIES AND OTHER INVOLVED INDIVIDUALS

### A.  Plaintiff

15.     Marilyn Mulero is a resident of the State of Illinois and resides in Chicago. She was wrongfully arrested and convicted for the murder of Jimmy Cruz, and wrongfully served 28 years behind bars. She was exonerated on August 9, 2022.

### B.  Defendants

16.     Defendant Reynaldo Guevara was a member of the Chicago Police Department from March 8, 1976 until June 15, 2005. He primarily served as a Gang Crime Specialist and then a Homicide Detective in Area Five.

17.     Defendant Ernest Halvorsen was a member of the Chicago Police Department from October 23, 1972 until April 15, 2010. He primarily served as a Detective in Area Five.

18.     Defendants Reynaldo Guevara, Ernest Halvorsen, Stephen Gawrys, and Anthony Riccio ("Police Officer Defendants") were CPD members acting under color of law and within the

6

scope of their employment for the City of Chicago. Their misconduct resulted in Plaintiff's wrongful arrest, conviction, and imprisonment.

19.     At all times relevant to the events described in this Complaint, Defendant Robert Biebel, and other unknown law enforcement officers, supervised the officers in the preceding paragraph ("Supervisor Defendants"). The Supervisor Defendants personally participated in the misconduct alleged in this Complaint and also directed and consented to the misconduct of those they supervised.

20.     Defendant City of Chicago is a municipal entity created and authorized under the laws of the State of Illinois. It is authorized under the laws of the State of Illinois to maintain a police department, the Chicago Police Department ("CPD"), which acts as the City's agent in the area of law enforcement and for which the City is ultimately responsible. The City assumes the risks incidental to the maintenance of a police force and the employment of police officers.

### C.     Other involved individuals

21.     Ismael "Mudo" Torres was a member of the Maniac Latin Disciples street gang who was purportedly murdered by the Latin Kings street gang, providing motive for the murders of Jimmy Cruz and Hector Reyes.

22.     Jacqueline (Jackie) Montanez shot and killed Jimmy Cruz and Hector Reyes at the age of 15 in retaliation for the murder of Ismael "Mudo" Torres.

23.     Madeline Mendoza was present at Humboldt Park when Montanez shot and killed Jimmy Cruz and Hector Reyes. Like Mulero, Mendoza was tormented by Guevara and Halvorsen and coerced into confessing to a murder she did not commit. Mendoza was exonerated on January 3, 2023 and received a certificate of innocence on July 11, 2023.

24.     Jimmy Cruz was a member of the Latin Kings who was killed by Montanez. Mulero was coerced into falsely confessing to Cruz's murder.

25.     Hector Reyes was a member of the Latin Kings who was killed by Montanez.

26.     Yvette Rodriguez was coerced by the individual Police Officer Defendants into providing false and fabricated statements implicating Mulero in Cruz's murder in exchange for leniency on her pending drug-related charges.

27.     Rhonda Riley was present with Yvette Rodriguez on the night Cruz and Reyes were murdered. The individual Police Officer Defendants attributed fabricated statements to Rhonda Riley that implicated Mulero, and in addition, manipulated a police lineup to ensure that Riley falsely implicated Mulero in the murders.

28.     Jackie Serrano and Marilyn Serrano lived in an apartment complex near Humboldt Park. The individual Police Officer Defendants coerced them into providing fabricated statements and testimony that they witnessed the murders and implicated Mulero.

29.     Joan Roberts was incarcerated in the Cook County Jail with Mulero during Mulero's pre-trial detention. In exchange for leniency on Roberts' armed robbery charges, she was coerced into giving false and fabricated statements and testimony implicating Mulero.

30.     ASA John Dillon was the Cook County Assistant State's Attorney who took Mulero's coerced and fabricated false confession while Mulero was being detained without probable cause and prior to being charged or indicted for any crime.

## **FACTUAL BACKGROUND**

31.     Ismael "Mudo" Torres was a member of the street gang the Maniac Latin Disciples and was rumored to have been murdered by a member of the Latin Kings rival street gang.

32.     On May 11, 1992, sometime shortly before midnight, Marilyn Mulero, Jackie Montanez, and Madeline Mendoza were in Humboldt Park with Hector Reyes and Jimmy Cruz, who were both Latin Kings.

33.     Just after midnight, on May 12, 1992, at approximately 12:15 a.m., Montanez followed Reyes into a bathroom in Humboldt Park and shot him in the back of the head. She then exited the bathroom, approached Cruz, and shot him in the back of the head as well. Montanez killed both Reyes and Cruz.

34.     Neither Mulero nor Mendoza participated in the shootings or had any knowledge the shootings were going to occur.

35.     Detectives Guevara and Halvorsen were assigned to the case and immediately suspected that the shootings were in retaliation for the killing of Mudo Torres.

**A.     Almost immediately after the shootings Montanez admitted to killing both Cruz and Reyes**

36.     About 45 minutes after the murders, at approximately 1:00 a.m. on May 12, 1992, Montanez ran into Yvette Rodriguez and bragged about shooting and killing both Jimmy Cruz and Hector Reyes.

37.     Later that day, Rodriguez (who was on parole at the time) was arrested by Chicago Police Officers for drug possession.

38.     Rodriguez told police that she could help them in their investigations into the Cruz and Reyes murders.

39.     Rodriguez then told her arresting officers that on May 12, 1992, at around 1:00 a.m., Montanez bragged to her about "shooting two kings a little while ago." The police report from that interview plainly describes how Rodriguez committed the murders:

> [Montanez] then tells Rodriguez that she followed one of the guys into the bathroom then shot him in the back of the head while he was urinating. She then came back out and her girlfriend [Mulero] was with the second victim. She [Montanez] then walked up behind him and shot him once in the head.

40.     Rodriguez's arresting officers then advised one or more of the individual Police Officer Defendants of Rodriguez's statements, leading to Rodriguez being interviewed again by one

or more of the individual Police Officer Defendants. During that interview Rodriguez – again – stated that Montanez had confessed to shooting *both* Cruz and Reyes.

**B.    CPD Detectives Guevara and Halvorsen coerce Marilyn Mulero into falsely confessing to murdering Cruz**

41.    Even though Montanez admitted to murdering Reyes and Cruz, Guevara and Halvorsen took the opportunity to lock up other suspected gang members. They set their sights on Montanez's friends, Mulero and Mendoza, who were at Humboldt Park at the time of the murders.

42.    After Yvette Rodriguez reported to CPD that Montanez admitted to the murders, she told them that Montanez, Mulero, and Mendoza would all be at Mudo Torres's wake. Detectives Guevara and Halvorsen staked out the wake and, on May 13, 1992, at approximately 9:00 p.m., arrested Mulero and Montanez.

43.    Neither Mulero nor Montanez were advised of their *Miranda* rights.

44.    Thereafter, and without a lawyer present, Guevara and Halvorsen drove Mulero and Montanez around while questioning them about the shootings. Both refused to speak.

45.    Guevara and Halvorsen then drove Mulero and Montanez into Latin King territory, hailed members of the Latin Kings over to their car and told them that "these are the two who killed your homeboys."

46.    Beyond placing Mulero in immediate grave danger, this egregious tactic on the part of Guevara and Halvorsen made Mulero believe that she would inevitably be killed by the Latin Kings in retaliation – if not right in that moment, then later. It also gave her the clear the impression that Guevara and Halvorsen were depraved and capable of anything. Not surprisingly, these events do not appear anywhere in CPD's official reports.

47.    After this blatantly unconstitutional coercion tactic, Guevara and Halvorsen drove Mulero and Montanez to the police station, where they arrived at approximately 9:30 p.m. and were placed in separate interrogation rooms. Again, they were not advised of their *Miranda* rights.

48.     Mulero was aggressively interrogated by the individual Police Officer Defendants. She asked to speak to an attorney serval times, but the individual Police Officer Defendants ignored or denied her requests.

49.     Throughout her interrogation, Mulero repeatedly asserted her innocence.

50.     Notwithstanding, Guevara and Halvorsen purposely and knowingly used coercive tactics in an effort to elicit a false confession. These include the following:

(a)  Guevara and Halvorsen told Mulero she had two options, either confess to one shooting or take the rap for both, in which case she would be executed by lethal injection.

(b)  Guevara and Halvorsen lied to Mulero by telling her that Montanez had already implicated her in both murders, and that if she did not confess now, she would never see her children again.

(c)  While explaining the potential consequence of the death penalty, Halvorsen stood behind Mulero, placed his finger against the back of her head, and made the sound of a gunshot.

51.     Mulero was forced to stay awake from the moment she was arrested around 9:00 p.m. until at least 9:00 a.m. the following day.

52.     Mulero, who was only 21 years-old, was terrified that she would be killed by the Latin Kings, terrified that she would be subjected to lethal injection and never see her children again, and terrified that Guevara and Halvorsen were unrelenting and would continue with their abusive interrogation tactics.

53.     Exhausted, terrified, and without any legal counsel to protect her, after hours upon hours of overnight interrogation, Mulero agreed to say what Guevara and Halvorsen told her to: she falsely confessed to killing Cruz.

54. Guevara and Halvorsen then left Mulero in the Area Five interrogation room handcuffed to the table. An hour or two later, on May 14, 1992, at 6:50 a.m., Guevara and Halvorsen returned with Cook County Assistant State's Attorney John Dillon.

55. ASA Dillon sat directly across from Mulero, who remained handcuffed to the table with Guevara and Halvorsen seated on both sides of her within arm's reach.

56. ASA Dillon told Mulero he was going to ask her some questions and that all she had to do was agree and say yes. A few minutes later, a court reporter entered the room, ASA Dillon asked a series of leading questions, and Mulero did as she was directed and falsely confessed to shooting Jimmy Cruz.

57. Mulero's false confession was memorialized as a recorded statement entitled "Investigation (Fatal Shooting of Jimmy Cruz & Hector Reyes)."

58. Mulero had not been indicted at the time of her interrogation and interview. In fact, she was not indicted with any related charges until June 19, 1992.

59. The individual Police Officer Defendants and Supervisor Defendants knew that Mulero gave a false confession, yet they presented Mulero's confession as if it was legitimate evidence and failed to disclose knowledge of, and participation in, fabricating and coercing Mulero's false confession.

**C. The Police Officer Defendants fabricate additional evidence against Mulero**

60. Consistent with their *modus operandi*, after coercing Mulero's confession, Guevara and Halvorsen took further steps to bolster the case by fabricating additional evidence implicating Mulero.

### i. Guevara and Halvorsen coerced Yvette Rodriguez into giving false statements and testimony

61. Rodriguez initially reported to CPD that Montanez admitted to committing the murders. However, she had at least one pending drug charge against her and Guevara and Halvorsen knew they would be able to leverage that.

62. Consistent with their *modus operandi*, Guevara and Halvorsen manipulated Rodriguez into changing her story to implicate Mulero by promising Rodriguez leniency on her pending case and, at the same time, threatening her with severe consequences if she did not change her story.

63. Guevara threatened Rodriguez by throwing a bag of cocaine in her car, stating that if she did not change her story to implicate Mulero, he would ensure she was arrested and convicted for the planted drugs.

64. As a result, in an interview conducted days after her original report, Rodriguez changed her story to say – for the first time – that Montanez, Mulero, and Mendoza all bragged about the shootings, and that Montanez only admitted to shooting one of the victims. This statement directly contradicted Rodriguez's initial statement that Montanez had admitted to both murders.

65. Then, in a third interview, Rodriguez changed her story yet again, claiming that Mulero, Montanez, and Mendoza asked her to participate in the shootings but that Rodriguez refused. This was the first time Rodriguez made this allegation.

66. In exchange for Rodriguez's fabricated statements and testimony at Mulero's sentencing hearing, Guevara and Halvorsen arranged for the drug charges against her to be dismissed.

67. The Police Officer Defendants and Supervisor Defendants knew that Yvette Rodriguez's statements were coerced and fabricated, yet they presented her statements as if they were legitimate evidence.

68. The individual Police Officer Defendants and Supervisor Defendants failed to disclose these coercive tactics.

### ii. Guevara and Halvorsen coerced Rhonda Riley into giving false statements

69. After coercing the false statements from Yvette Rodriguez, Guevara and Halvorsen met with Rhonda Riley.

70. Guevara and Halvorsen claimed in various police reports that Riley corroborated Rodriguez's statement that Montanez and Mulero invited them to participate in the shootings. Guevara and Halvorsen also reported that Riley could not corroborate the contact after the murders – where Rodriguez claimed Montanez, Mulero, and Mendoza bragged about the shootings – because Riley was too drunk to remember.

71. These purported statements by Riley were entirely fabricated.

72. In fact, Riley only heard Montanez and Mulero invite them to the park. Riley *never* said they invited them to participate in the shootings or alluded to shootings in any respect whatsoever. Moreover, Riley was never a drinker so, contrary to Guevara and Halvorsen's report, she could not have been too drunk to remember anything.

73. In addition, Guevara and Halvorsen manipulated a police lineup so that Riley identified Mulero. To do so, Guevara and Halvorsen handed Riley a picture of Mulero and directed her to identify the woman depicted in the picture.

74. This lineup identification was blatantly unconstitutional. It was not just unduly suggestive, but the result was a foregone conclusion because Guevara and Halvorsen pointedly directed Riley to identify Mulero.

75. Meanwhile, Guevara and Halvorsen falsely reported that Riley identified Mulero in a legitimate lineup procedure.

76. The individual Police Officer Defendants and Supervisor Defendants knew Rhonda Riley's statement and identification were coerced and fabricated, yet the individual Police Officer

14

Defendants and Supervisor Defendants presented her statement and identification as if they were legitimate evidence.

77.     The individual Police Officer Defendants and Supervisor Defendants failed to disclose their coercive tactics and the fabricated nature of this evidence.

### iii.     Guevara and Halvorsen coerced Jackie Serrano and Marilyn Serrano into giving false statements and testimony

78.     After coercing Mulero's confession and false statements from Rodriguez and Riley, Guevara and Halvorsen manipulated Jackie Serrano and Marilyn Serrano into giving false statements implicating Mulero in the murder.

79.     Jackie Serrano and Marilyn Serrano lived in an apartment building near Humboldt Park where the murders were committed.

80.     Jackie Serrano was the girlfriend of one of the murdered victims, and Guevara and Halvorsen knew they could use this fact to manipulate her into providing a false statement.

81.     According to Guevara and Halvorsen, Jackie Serrano said she was looking out her window at Humboldt Park just past midnight, saw two men and three women, and then heard a gunshot. She then saw *the shorter woman* walk up behind one of the men, heard another gun shot, and saw a muzzle flash behind the man's head. Because Mulero was several inches shorter than Montanez, Jackie Serrano's story implicated her. This story was fabricated by Guevara and Halvorsen and coerced from Jackie Serrano.

82.     In fact, the story Guevara and Halvorsen fed to Jackie Serrano was a literal impossibility. Jackie Serrano's apartment was about 489 feet away and at a different elevation from the location of the shootings with multiple park features obstructing her view. As such, it was a physical impossibility for Jackie Serrano to witness the shootings as she claimed.

83.     Because Jackie Serrano's story was false and fabricated, she could not keep it straight and changed it multiple times before testifying at Mulero's sentencing hearing and supporting Guevara and Halvorsen's fabricated narrative.

84.     The story fed to Marilyn Serrano was similarly fictitious. Marilyn Serrano was Jackie Serrano's aunt and lived in the same building as Jackie but one floor above her. Marilyn's story was that she was sleeping in her apartment when her niece Jackie came in and told her to look out the window. Marilyn Serrano said she then saw two women with a man when she heard a gunshot and saw a muzzle flash.

85.     Marilyn Serrano's story cannot be reconciled with Jackie's. To assume both as true would mean that after hearing the first gunshot, Jackie ran upstairs to her aunt's apartment, went in, woke her up, and got over to the window – all before the second gunshot. But perhaps most importantly, in not one of the many differing accounts provided by Jackie Serrano did she ever say that she went to her aunt's apartment.

86.     The individual Police Officer Defendants and Supervisor Defendants knew of these facts, knew of Jackie Serrano's relationship to the victim, and knew that both Jackie Serrano's and Marilyn Serrano's statements were fabricated. Yet, the individual Police Officer Defendants and Supervisor Defendants presented their statements as if they were legitimate evidence.

87.     The individual Police Officer Defendants and Supervisor Defendants failed to disclose their coercive tactics and the fabricated nature of this evidence.

### iv.     Guevara and Halvorsen coerced jailhouse informant Joan Roberts into giving false statements and testimony

88.     In furtherance of their conspiracy to frame Mulero, on June 7, 1993, Detectives Guevara and Halvorsen coerced a fabricated statement and testimony from a jailhouse informant, Joan Roberts.

89. Joan Roberts was incarcerated on charges of armed robbery in the Cook County Jail with Mulero during her pre-trial detention.

90. As a detective in Roberts' neighborhood, and given Roberts' criminal history, Halvorsen had known Roberts – and her family – for years.

91. Guevara and Halvorsen used these facts to manipulate Roberts by offering a quick release from jail in exchange for statements and testimony from Roberts implicating Mulero in the murder.

92. Parroting the false narrative created by Guevara and Halvorsen, Roberts testified at Mulero's sentencing hearing that, according to Mendoza, Jackie Montanez shot the man in the bathroom and then Mulero took the gun from her and shot the other man in the park. Roberts also claimed that Mulero asked her to "take out" Montanez for talking to the police.

93. After testifying against Mulero, as directed by Guevara and Halvorsen, Roberts was released from jail and placed on electronic monitoring. Her armed robbery charges were reduced to misdemeanor robbery, and she was placed on probation.

94. Years later, Roberts recanted on her statements and testimony by admitting that she only said what she said after being threatened by Guevara and Halvorsen. Specifically, Roberts said Guevara and Halvorsen threatened to "make [her] life miserable," to have other officers "put things on [her]," that they would send gang members after her mother, and that they would ensure that she received an extended sentence on her pending armed robbery charges if she did not go along with the story and testify against Mulero.

95. Roberts has further said that Guevara and Halvorsen made her afraid, and that she felt she had no choice but to do what they said.

96. Regarding Roberts' statement that Mulero asked her to "take out Montanez," Roberts explained that she initially told Guevara and Halvorsen that Mulero never told her anything, but that

in response, she was directed to make a statement against Mulero suggesting that Mulero had no remorse, and that if she did not give a statement to that effect, the deal for her probation on her pending armed robbery charges was off.

97. The individual Police Officer Defendants and Supervisor Defendants knew these statements were coerced and fabricated, yet they presented Roberts' statements and testimony as if they were legitimate evidence.

98. The individual Police Officer Defendants and Supervisor Defendants failed to disclose their coercive tactics and the fabricated nature of this evidence.

**D.   Mulero is wrongfully charged, convicted, and sentenced to death**

99. With all the false evidence created by Guevara, Halvorsen, and their co-conspirators – including Mulero's false confession, and the false statements from Yvette Rodriguez, Rhonda Riley, Jackie Serrano, Marilyn Serrano, and Joan Roberts – on June 19, 1992, Mulero was indicted and charged with first degree murder.

100. While awaiting trial, Mulero's attorney told her that because of her confession she was "going to be brought out in a body bag." Her attorney further advised that if she pled guilty, she might garner some sympathy and suggested that the choice came down to whether she would like to see her children again or receive "the injection."

101. On September 27, 1993, Mulero pleaded guilty to first degree murder because she believed that it was her only choice.

102. Mulero's guilty plea was involuntary and a direct result of the individual Police Officer Defendants' misconduct, including Guevara and Halvorsen coercing her into a false confession.

103. After her plea, Mulero's criminal trial proceeded to the sentencing phase. A jury found her eligible for the death penalty and, on November 12, 1993, she was sentenced to death for a crime she did not commit.

### E.  Post-conviction

104.    Now 23 years-old, and as a mother of two, Mulero arrived at Dwight Correctional Center on December 23, 1993, as the first Latina sentenced to death in Illinois history.

105.    As Mulero's reality set in and she thought about never seeing her children again, Mulero felt "like a volcano erupted shooting lava down my veins." She wept the entire first night she was on death row. At one point during her first night, she fell to her knees searching for answers: "Why Me! What have I done to deserve this? I have not killed anyone! So why should I pay with my life?"

106.    For the first several weeks of her incarceration, Mulero tried to sleep her life away in the hopes it would make it go faster. She began experiencing severe depression, especially after learning she had an execution date in February. Three men were executed while Mulero was on death row, and she sat in horror not knowing when her fate would come.

107.    After being wrongfully convicted and sentenced to death, Mulero underwent a long and desperate process to obtain justice.

108.    On January 10, 1994, Mulero sought to withdraw her guilty plea, and in doing so, cited to a psychological evaluation in which she was found to possess various psychological deficits that predisposed her towards being suggestible. She was found to have a borderline verbal I.Q., was easily misled, and tended to answer affirmatively regardless of whether she understood what was being asked.

109.    On May 22, 1994, Montanez had her roommate write a letter on her behalf (which Montanez signed) in which Montanez confessed to shooting both Jimmy Cruz and Hector Reyes:

"I'm writing this letter to help Marilyn Mulero to come off death row. I'm confessing to both the murders. I killed Jimmy Cruz and Hector Reyes. Marilyn Mulero did not shoot anyone."



110.    On December 7, 1994, Mulero's request to withdraw her plea was denied.

111.    Mulero then appealed to the Illinois Supreme Court. On May 22, 1997, the Supreme Court affirmed that Mulero could not withdraw her guilty plea, but the Court vacated her death sentence based on prosecutorial misconduct during the sentencing phase and remanded the matter for a new sentencing hearing.

112.    Mulero had already spent five years on death row before her death sentence was vacated.

113.    On November 19, 1998, Mulero was sentenced to life in prison. She then filed a series of post-conviction petitions and appeals.

114.    On January 29, 2017, Jackie Montanez again admitted to shooting both Jimmy Cruz and Hector Reyes, and that Mulero had nothing to do with the crime:

> [Marilyn Mulero and I] have been locked up for 24 years and 8 months, and I think it's time that the truth be told . . . I honestly don't think it's right that I walk out of these gates in 6 years and 6 months and leave Mulero here with a life sentence when she "DID NOT KILL ANYONE." I have been saying this since 1994 when I had my roommate write a

> *letter for me and I signed it saying you have an innocent woman on death row. I Jacqueline Montanez alone killed James Cruz and Hector Reyes with my gun. Once again please believe me when I say Mulero really didn't kill anyone.*

115.    On February 22, 2017, Jackie Montanez gave a videotaped interview to the Chicago Tribune, and – again – confessed to shooting both Jimmy Cruz and Hector Reyes:

> *I pulled my gun out and shot him [Hector Reyes] once in the back of the head. As he [Hector Reyes] dropped, I came out the bathroom and ran towards the other one [Jimmy Cruz]. The other one had a gun and he, my co-defendant, Mendoza was scared cause you could tell that he [Jimmy Cruz] was about to do something to her cause I'm sure he [Jimmy Cruz] heard the gunshot, so I grabbed the gun and just shot, and when I shot, it hit him [Jimmy Cruz], and he hit the floor.*

116.    On April 6, 2020, after the truth about Detectives Guevara, Halvorsen, and Area Five of the CPD came to light (as detailed below), Governor Pritzker commuted Mulero's life sentence. On April 8, 2020, after having served 28 years behind bars for a crime she did not commit, Mulero was released from prison.

117.    On August 9, 2022, Mulero's case was terminated when her conviction was vacated and the Cook County State's Attorney agreed to dismiss all charges against her. Mulero's exoneration was part of the first ever mass exoneration of murder convictions in the history of the United States.

118.    Mulero's damages are immeasurable and include, but are not limited to, the following:

(a) her entire adult life has been consumed by the horror of her wrongful imprisonment;

(b) she has been branded a murderer and has suffered profound reputational harm as a result;

(c) she was labeled a murderer of Latin Kings – one of the most powerful street gangs in Chicago and within the Illinois prison system – placing her and her family in profound danger and in constant fear of retribution;

(d) she was taken away from her two young sons, she lost her chance to raise them, and her relationship with them has been profoundly and permanently affected;

(e)  she missed out on decades of relationships with friends and family, and opportunities for intimate relationships;

(f)  she was robbed of her young adulthood and her formative years;

(g)  she was deprived of opportunities to engage in meaningful employment, to develop a career, and to pursue her interests and passions; and

(h)  she was deprived of all of the basic pleasures of human experience which all free people enjoy as a matter of right.

119.  In addition, Defendants' misconduct continues to cause Mulero extreme physical and psychological pain and suffering, humiliation, constant fear, nightmares, anxiety, depression, despair, rage, and other physical and psychological effects.

## RELEVANT PATTERN AND PRACTICE OF MISCONDUCT BY DETECTIVES GUEVARA, HALVERSON, AND THE CPD

120.  Reynaldo Guevara and/or Ernest Halvorsen are responsible for dozens of wrongful convictions, including those of Eruby Abrego, Roberto Almodovar, Carlos Andino, Xavier Arcos, Robert Bouto, Jeremiah Cain, David Colon, Jose Cruz, Edwin Davila, Arturo DeLeon-Reyes, Johnny Flores, David Gecht, Ariel Gomez, Alfredo Gonzalez, Nelson Gonzalez, Juan Hernandez, Rosendo Hernandez, Geraldo Iglesias, Demetrius Johnson, Juan Johnson, Richard Kwil, John Martinez, Jose Maysonet, Madeline Mendoza, Jose Montanez, Reynaldo Munoz, William Negron, Jaime Rios, Gamalier Rivera, Jacques Rivera, Daniel Rodriguez, Ricardo Rodriguez, Adolfo Rosario, Armando Serrano, Thomas Sierra, Gabriel Solache, and, of course, Marilyn Mulero. These innocent men and women have collectively served approximately *800 years* behind bars due to the police misconduct by Guevara, Halvorsen, and CPD.

121.  Details involving many of these convictions and the gross misconduct on the part of Guevara and Halvorsen are summarized below. Collectively, they reveal a clear *modus operandi*: coerce false confessions through psychological and/or physical abuse; manipulate and/or fabricate witness

22

statements and testimony through intimidation and threats; falsify reports; suppress evidence; commit perjury; and, ultimately, cause innocent people to spend decades in prison for crimes they did not commit.

122.    As sworn members of the Chicago Police Department charged with the responsibility to protect and defend Chicagoans, Guevara and Halvorsen operated without any moral bounds and with utter indifference to and conscious disregard of the civil rights and human rights guaranteed to all Americans.

123.    Their conduct was not rare, isolated, or unknown. Instead, it was a pervasive pattern and practice that occurred across two decades. It could not have occurred without CPD's knowledge and approval (tacit or otherwise), nor could it have occurred without CPD's widespread custom and practice of condoning police misconduct and failing to train, supervise, and discipline CPD members.

124.    Because CPD routinely condoned police misconduct and failed to discipline CPD officers, Guevara and Halvorsen believed they could carry on their pattern and practice and engage in abusive, unethical, and unconstitutional behavior without consequence or repercussion.

125.    Even now, where a bright public light has been shined on Guevara's and Halvorsen's misdeeds and where cases against them have cost City taxpayers almost $100 million, Guevara continues to collect more than $80,000 per year from his police pension.

126.    The following cases illustrate a pervasive pattern and practice by Guevara and/or Halvorsen involving the same unconstitutional misconduct they used with Marilyn Mulero, *i.e.*, coercing false confessions by, among other things, taking suspects into the rival gang territory and threatening them that if they don't confess they'll lose their children and spend their lives in jail; coercing and manipulating witnesses into false identifications by telling them who to identify and/or using unconstitutionally suggestive photo arrays and lineups; manipulating witnesses into providing false statements and testimony in exchange for leniency notwithstanding knowing that the witnesses

did not and could not actually witness the crime; and burying exculpatory evidence and failing to follow legitimate leads that were inconsistent with who they wanted to frame.

(a)     ***Reynaldo Munoz (1985):*** Reynaldo Munoz was wrongfully charged and convicted of murdering Ivan Mena and shooting Bobby Garcia in 1985. Garcia survived and was unable to identify the shooter. Two days later, Guevara detained and interrogated 16-year-old Reynaldo Munoz as he was walking down the street. When Munoz denied knowing anything about the shootings Guevara hit him in the face. Guevara also drove Munoz into hostile gang territory and threatened to let him out of the car if he didn't confess. Guevara pulled Munoz out of the car as 10 to 15 gang members approached Munoz, spit on him, and started beating him. As part of their effort to wrongfully convict Munoz, Guevara and Halvorsen also elicited false identifications and failed to disclose exculpatory evidence.

(b)     ***Jacques Rivera (1988):*** Jacques Rivera was wrongfully charged and convicted of murdering Felix Valentin. There was one witness to the shooting, who was then 11-years-old. He told police that he had a clear view of the gunman and had seen him playing baseball at Humboldt Park several times that summer. The witness initially identified Jose Rodriguez, who was arrested but never charged. Later, the witness identified Rivera in a photo array and a lineup. There was no physical evidence connecting Rivera to the murder and he was at home with his wife and kids at the time of the shooting. Just prior to trial, the single witness told the police and prosecutors that Rivera was not the shooter and that he had seen the actual shooter several days after misidentifying Rivera. The police, including Guevara, buried this fact. A federal jury later awarded Rivera $17.175 million for 21 years he wrongfully served behind bars.

(c)     ***Victor Vera (1989):*** In 1989, Guevara coerced Victor Vera into falsely confessing to the murder of Edwin Castenada. As part of the coercion, Guevara drove Vera

24

into rival gang territory and threatened to release him there unless he confessed. Concerned for his life, Vera did so even though he had nothing to do with the murder.

(d)   ***Jaime Rios (1989):*** Jaime Rios was wrongfully charged and convicted of murdering Luis Morales. There were two eyewitnesses to the shooting, one who could not identify anyone and the other who told the police the shooter was Macho Melendez. When Guevara picked up the investigation, he claimed two informants told him that the men involved in the shooting were known as "Tino" and "Jaime." Guevara recognized the latter as Jaime Rios, who he had contact with in the past, and arrested him. During interrogation by Guevara and others, including Halvorsen, Rios was physically and psychologically abused, including having his head slammed into the table. Despite denying having anything to do with the crime, Rios ultimately caved and gave a statement falsely confessing to his involvement. Rios testified during his criminal trial that Guevara fed him the details of the shooting which he ultimately incorporated into his statement. Rios further testified that Guevara threatened to take away his child unless he made a statement, and that he only agreed to make the statement out of fear of losing his son. Guevara also coerced two other witnesses into making false statements implicating Rios, beating one and telling the other that if he did not identify Rios he would take away his child.

(e)   ***Juan Johnson (1989):*** Juan Johnson was wrongfully charged and convicted of murdering Ricardo Fernandez, who was beaten to death at a party. The prosecution's case rested on the testimony of three purported eyewitnesses who had been present at the club. The three witnesses eventually recanted their testimony and revealed that they were coerced by Guevara to identify Juan Johnson. A federal jury later awarded Johnson $21 million in damages for the 11 years he wrongfully served behind bars.

(f)      ***Johnny Flores (1990):*** Johnny Flores was wrongfully charged and convicted of murdering Jeffrey Rhodes. No physical evidence linked Flores to the crime and Flores has always asserted his innocence. The only evidence used to convict Flores came from Guevara's fabricated tip and an identification from a witness who was grossly intoxicated at the time of the shooting and later identified Flores out of lineups when he was the only person consistently used in all three lineups (a plainly suggestive practice).

(g)      ***Jose Maysonet and Alfredo Gonzalez (1990):*** Jose Maysonet and Alfredo Gonzalez were wrongfully charged and convicted of murdering Torrence and Kevin Wiley. There were no witnesses. Months after the shooting, Guevara arrested 22-year-old Jose Maysonet, who did not speak English and was described as mentally slow. Guevara interrogated him for more than 17 hours and ignored his pleas for a lawyer. During the interrogation, Guevara beat Maysonet with a telephone book and a flashlight and grabbed and squeezed his testicles. Another detective brought Maysonet's pregnant girlfriend into the interrogation room, and she told Maysonet that unless he cooperated, they would lose their children. Guevara also threatened to arrest Maysonet's sister, girlfriend, and other family members. Ultimately, Maysonet agreed to a statement implicating himself and others, including Alfredo Gonzalez, in the murders. Gonzalez was then arrested and, like Maysonet, was physically abused by Guevara until he gave a false statement.

(h)      ***Demetrius Johnson (1991):*** Demetrius Johnson, only 15-years-old, was wrongfully charged and later convicted of murdering Edwin Fred. Immediately after the murder, Bryan Johns was identified as a suspected and taken into custody. One eyewitness to the shooting positively identified Johns as the gunmen, but Guevara buried the report and released Johns from custody. Guevara later arrested Johnson. Several alibi witnesses reported they were with Johnson celebrating the Bulls' first NBA championship at the time of the

26

shooting. Three witnesses identified Johnson in a lineup, but only after Guevara showed all three witnesses a photo of Johnson. The lineup report where Johns was positively identified as the shooter did not surface for almost 30 years.

(i)     ***Daniel Rodriguez (1991):*** Daniel Rodriguez was wrongfully charged and convicted of murdering Jose Hernandez, Jr. in the Humboldt Park neighborhood. Guevara and Halvorsen coerced a false confession from Rodriguez by beating him in the chest. They also coerced false statements from two alleged eyewitnesses, David Velasquez and Jason Rivera. Velasquez later admitted he signed a statement implicating Rodriguez after Guevara threatened to charge him with an unrelated murder. Evidence also came out that Rivera was paid "living expenses" by the State both before and after testifying against Rodriguez, and further, that his mother was in a relationship with Guevara.

(j)     ***David Colon (Lugo) (1991):*** David Colon was wrongfully charged and convicted of murdering Michel Velez. After Velez was shot, he told the paramedics the gunman was "Malo." Colon was a member of the Gangster Disciples known as "Malo," but there were other members of the same gang who used the same nickname. Guevara and Halvorsen, however, targeted Colon. One witness, Efrain Sanchez, who saw the aftermath of the shooting out of a second story window, identified Colon but only after he was told by the police that he was the shooter. Meanwhile, Sanchez's son, Julio, was riding a bike nearby at the time of the shooting and later said that Guevara and Halvorsen repeatedly pressured him to identify Colon as well.

(k)     ***Robert Bouto (1993):*** Robert Bouto was wrongfully charged and convicted with murdering Salvador Ruvalcaba. The murder occurred on May 14, 1993 near Roosevelt High School shortly after school let out that day. At the time of the shooting, Bouto was a few blocks away in an alley with his high school girlfriend, which she and her friend have

consistently maintained for decades. Bouto was taken into custody because some of his clothing allegedly matched the description of the shooter. Bouto did not otherwise match the shooter's description – he had no ponytail, he was significantly taller than the shooter, he did not have white high-top shoes, his shorts were neither "black" or "baggy," and he was not "clean shaven". Guevara secured false identifications of Bouto by placing him in handcuffs while the others in the lineup were not, using improperly suggestive lineups where only Bouto's clothing remotely resembled the shooters and, in one instance, telling a witness that Bouto was in the number three position.

(l)     ***Armando Serrano and Jose Montanez (1993):*** Armando Serrano and Jose Montanez were wrongfully charged and convicted of murdering Rodrigo Vargas. Their convictions were based on false statements from Francisco Vicente, who Guevara and Halvorsen were able to manipulate by promising a minimum sentence on three pending armed robberies Vicente had been charged with and giving him special privileges in jail including home cooked meals, visits from his girlfriend, and Nike track suits. Vincente later acknowledgment that he testified falsely because he had been coerced and beaten by Guevara and Halvorsen. A report authored by Sidley Austin after investigating Guevara's cases concluded that Serrano and Montanez, among others, were "more likely than not actually innocent."

(m)     ***Jose Cruz (1993):*** Jose Cruz was wrongfully charged and convicted of murdering Antwane Douglas. A witness, Vernon Meadors, was also shot and told police there were three assailants and the front passenger was a Hispanic male. When Meadors got home from the hospital Guevara and Halvorsen showed him a photo array that included Cruz. Meadors did not identify anyone. After a Tribune article was published identifying Meadors name and address he was afraid and asked for assurances that he would be protected if he

made an identification. The police agreed to put Meadors into witness protection, and he identified Cruz out of the same photo array. Meanwhile, two witnesses had come forward to Guevara to say that the assailants were Black. Guevara manipulated one of the witnesses to sign a statement he couldn't read that reported the shooter was Hispanic. The other witness was never followed up with.

(n)     ***William Negron and Roberto Almodovar (1994):*** William Negron and Roberto Almodovar were wrongfully charged and convicted of murdering Amy Merkes and Jorge Rodriguez. There was no physical or forensic evidence connecting Negron or Almodovar to the shooting. A survivor to the shooting falsely identified Negron and Almodovar after Guevara went to see her in the hospital and brought photographs of Negron and Almodovar, telling her: "These are the guys who did it." Another witness falsely identified Nelson and Almodovar after Guevara showed him pictures and told him they were the ones involved.

(o)     ***Thomas Sierra (1995):*** Thomas Sierra was wrongfully charged and convicted of murdering Noel Andujar. Eyewitnesses to the shooting reported that the shooter was riding in a Black Buick and made hand gestures indicating he was a member of the Spanish Cobras street gang. Later, Guevara was investigating another murder when he saw Sierra riding as a passenger in Black Buick. Sierra was a member of the Imperial Gangsters, not the Spanish Cobras. Guevara subsequently framed Sierra by telling both eyewitnesses that Sierra was the shooter before they were asked to pick him out of a photo array.

(p)     ***Ricardo Rodriguez (1995):*** Ricardo Rodriguez was wrongfully charged and convicted of murdering Rodney Kemppainen. Two weeks after the murder, Guevara claimed he received an anonymous telephone call reporting the shooter was "Casper," who Guevara knew to be Rodriguez. Guevara then manipulated two witnesses, Auerlio Martinez and

Rodolfo Zaragoza, into identifying Rodriguez and testifying against him. Martinez's identification was reported as "tentative." Zaragoza later provided a sworn statement that the only reason he identified Rodriguez was because Guevara told him he was the shooter.

(q)     ***Edwin Davila (1995):*** Edwin Davila was wrongfully charged and convicted of murdering Jaime Alvarez. There were two eyewitnesses to the shooting, both of whom originally said they were not able to see the shooter. Guevara and Halvorsen began investigating the crime and targeted 21-year-old, Davila, who was a member of the Jivers street gang. The two eyewitnesses, who weeks earlier said they did not see the shooter, were presented with a photo array and live lineup, and positively identified Davila. Prior to the lineup Guevara told Davila that the witnesses would identify him "and it did not matter if he did it." During the lineup, Davila was the only one asked to turn around, displaying his large Jivers tattoo. Additionally, there was evidence that witnesses saw someone other than Davila shoot at the car but the police did not follow the leads.

(r)     ***Gamalier Rivera (1996)*** Gamalier Rivera was wrongfully charged and convicted of shooting Antonio Diaz and murdering Jesus Ramos. The shooting occurred during a drive-by in a dark alley at night. There were four witnesses, all of whom were in the relative line of fire and ducked as soon as the shooting began. Initially, none of the four could provide much of a description. After arresting Rivera on possession of marijuana charges, Guevara suggestively presented him to the four witnesses who, months after the shooting, positively identified him. There was no physical evidence connecting Rivera to the crime.

(s)     ***Ariel Gomez (1997):*** Ariel Gomez was wrongfully charged and convicted of murdering Concepcion Diaz. On June 13,1997 Gomez was out with friends celebrating the Chicago Bulls wining their fifth NBA title. While riding as a passenger in a car through a crowd, Gomez fired a single shot into the sky as part of the celebration. Thereafter, several

more gunshots were fired by someone in the parking lot, at least two of which struck and killed Concepcion Diaz. Trajectory evidence showed the shots were fired by someone at ground level and that the bullets did not come from Gomez's gun. Guevara's interrogation of Gomez began in the early morning hours and continued overnight and into the early afternoon the next day. When Gomez refused to confess to the killing, detectives abused him by grabbing him around the neck and Guevara punched him numerous times in the face, stomach, back, arms, and shoulders. Ultimately, Gomez was coerced into stating that he fired into the crowd. As part of the investigation, Guevara and his colleagues attempted to intimidate other witnesses into implicating Gomez. Additionally, Guevara failed to disclose the statement of a witness who said Gomez fired straight upwards in the air.

(t)     *Juan Hernandez and Rosendo Hernandez (1997):* Juan and Rosendo Hernandez were wrongfully charged and convicted of the 1997 shooting of Jorge Gonzalez despite having nothing to do with the murder. Guevara and his cohorts, including notoriously corrupt CPD officer Joseph Miedzianowski, framed the Hernandez brothers because Juan Hernandez was purportedly interfering with Miedzianowski's drug operation. The only distinguishing characteristic of the shooter that any witness could provide was that one of the shooters was bald. No weapons, forensics, or physical evidence of any kind was found at the scene or during the initial investigation to connect the Hernandez brothers to the crime. Detectives, including Guevara, created deliberately suggestive photo arrays containing the pictures of the Hernandez brothers despite knowing that none of the scene witnesses could truly identify the shooter. It was later determined by the FBI that Guevara, in connection with Miedzianowski, would accept bribes to change positive or negative identifications during lineups for murder cases.

(u)     ***Gabriel Solache and Arturo DeLeon-Reyes (1998):*** Arturo DeLeon-Reyes and Gabriel Solache were charged and convicted of stabbing to death Mariano and Jacinta Soto and abducting their infant daughter and three-year-old son. Not one piece of evidence ever connected them to these crimes despite there being a crime scene full of blood and other physical evidence. Their prosecution relied almost exclusively on false confessions obtained by Guevara. Guevara beat Solache in the head so badly he lost hearing in his left ear. Guevara not only beat DeLeon-Reyes but threatened that he would get the electric chair unless he confessed. Neither Solache nor DeLeon Reyes spoke English, but they were coerced into signing written statements in English that they could not read and were not read to them.

(v)     ***John Martinez (1998):*** John Martinez was wrongfully charged and convicted of murdering Daniel Garcia, who was found beaten in an alley. Martinez's arrest, prosecution, and conviction were based on identifications by eyewitnesses that were wholly manufactured by Guevara and Halvorsen, and a false statement obtained from Martinez after an abusive days-long interrogation. Martinez was placed in an "extended investigative hold" for over 34 hours where he was kept in a windowless room for two nights, was prevented from sleeping, and was only given a little food but nothing to drink. Martinez ultimately agreed to sign a statement, which he could not read but thought was simply confirming that he was a post-occurrence witness. As part of the investigation, Guevara coerced false statements identifications from witnesses who did not or could not see the actual beating.

(w)     ***David Gecht and Richard Kwil (1999):*** David Gecht and Richard Kwil were wrongfully charged and convicted of murdering Roberto Cruz. The murder occurred at Bristol's nightclub in Chicago on January 29, 1999. When CPD detectives arrived on scene, the bouncer informed them that the two men seen arguing with Cruz were either "Latin or Black," describing one man as approximately 6'1" and 350 pounds with a goatee, and the other

as 5'7" and 250 pounds. Gecht was Caucasian, 5'5" and 140 pounds, and in no way fit the suspect description. According to Guevara, however, Kwil admitted he was present for the shooting and said Gecht was the gunman. The day after the murder, an anonymous caller informed detectives that the men responsible for the murder of Cruz were Ruben Hernandez and Benjamin DeJesus, but no efforts were made to pursue them as suspects. Instead, Guevara and Halvorsen arrested Gecht and took him to the Area Five police station where he was subjected to hours of interrogation during which he was physically beaten, not given food or water, and not allowed to call an attorney. Gecht repeatedly denied having any involvement with or knowledge of the crime. Finally, after many hours of abuse and torture, Guevara told Gecht if he signed a statement admitting his involvement in the crime he could go home. At that point, exhausted, hungry, beaten, and bloody, Gecht gave a false confession parroting what Guevara wanted him to say. Guevara and Halvorsen also obtained a false statement implicating Gecht from Gecht's girlfriend by telling her she would be charged as an accessory to murder and that her baby would be taken away. Kwil was arrested and charged too, largely based on a false statement and confession coerced by Guevara after Kwil that he would never see his daughter again.

(x) *Eruby Abrego and Jeremiah Cain (1999):* Eruby Abrego and Jeremiah Cain were wrongfully charged and convicted of murdering Jose Garcia. All witnesses to the shooting described the shooter as having a larger build and a medium to dark complexion. Abrego, who was charged with shooting Garcia, was 5'4" and had a light complexion. Front and center to Abrego's conviction was his false confession. They brought Abrego to the Area Five police station, chained him to a wall, did not give him food or water, did not let him use the restroom, did not read him his rights, and did not provide him the opportunity to talk to a lawyer despite his requests for one. One of Guevara's Area five colleagues repeated punched

33

Abrego in the ribs, back, and chest, causing him to vomit blood. As part of the investigation, Guevara coerced false statements from two witnesses and told one witness to pick Abrego out of a lineup. Cain was originally arrested for supplying the gun used in the murder. During his interrogation, he was never read his *Miranda* rights and was punched in the face and chest. He was also told that if he would only be charged with supplying the gun if he confessed, but otherwise he would be charged with the whole murder. Cain acquiesced to the false confession but was charged and convicted with murder nonetheless.

127.    There are many other instances of reported misconduct by Guevara and/or Halvorsen that fortunately did not result is wrongful convictions, but are nonetheless evidence of their pattern, practice, and *modus operandi* described above, as well as CPD's practice to look the other way. Examples include the following:

(a)    In 1983, Guevara coerced a false murder confession from Leshurn Hunt by beating him relentlessly and depriving him of food, water, and sleep. The trial court fortunately suppressed the confession. Later, Hunt won a civil rights verdict against the City for excessive detention.

(b)    In 1989, Guevara coerced Virgilio Munoz into falsely identifying Manuel Rivera by telling Munoz that he would "go down for murder" if he did not identify Rivera.

(c)    In 1991, Guevara coerced Wilfredo Rosario into falsely identifying Xavier Arcos by telling Rosario that the murder would be "pinned" on him if he did not identify Arcos. Rosario initially did as he was told, but then recanted at trial. Arcos was nonetheless convicted, but fortunately his conviction was overturned on appeal.

(d)    In 1992, Bill Dorsch, a longtime member of CPD, was assisting Guevara in the investigation of a murder. Two teenagers claimed to witness the murder and were called in to see if they could identify the shooter in a photo array. So as to avoid influence, Dorsch

34

asked one teenager to stand back against the wall while the other looked at the photo array. The first witness struggled as he looked at the photos until Guevara point his finger next to one and said, "that's him." The witness fell in line. Later, without Guevara, Dorsch confronted the two witnesses about the identification and was told they were paid by a gang member to make the identification. Dorsch then convinced prosecutors to drop the charges. When he returned to Area Five, a CPD supervisor challenged him, saying "What the fuck are you doing? We're never going to solve the case." Although Dorsch did not formally report Guevara's misconduct, he said many people knew of it.

(e)     In 1993, Guevara coerced a false confession from Adolfo Frias Munoz by beating him and his nephew, and by telling Munoz that his wife would be beaten and arrested.

(f)     In 1993, Guevara coerced a confession from 15-year-old Eliezer Cruzado by telling him that he would spend the rest of his life in jail and would never see his family again if he did not confess.

(g)     In 1995, Guevara coerced Gloria Ortiz Bordoy into making a false statement against Santos Flores. To do so, Guevara subjected Bordoy to a lengthy interrogation during which he physically threatened her and told her that her kids would be taken away by the Department of Children and Family Services.

(h)     In 1997, Guevara coerced Robert Ruiz into falsely identifying Freddy Santiago Concepcion Santiago in a murder. To do so, Guevara repeatedly detained Ruiz over several weeks and held him without food, water, or access to the bathroom. Ruiz recanted the identification at trial.

128.     Notwithstanding a known, pervasive pattern and practice occurring across two decades, the City of Chicago never stepped in to stop Guevara's and Halvorsen's unconstitutional tactics, which were destroying dozens of lives.

129.    Guevara received two paltry suspensions, neither of which had to do with his pattern and practice of framing innocent people. In 1996, Guevara was suspended for two days for "conduct unbecoming" for lying about beating up a bar patron in an off-duty fight. In 1999, he was suspended for 20 days after verbally abusing and physically threatening an officer who wrote Guevara a parking ticket. Even after these incidents, Guevara remained on the force.

130.    Halvorsen was never disciplined for anything.

131.    The City of Chicago not only turned a blind eye to the overwhelming pattern and practice of misconduct by Guevara and Halvorsen during their respective tenures, but the City continues to do so by defending them in legal proceedings. Meanwhile, Illinois courts have strongly condemned their misconduct. For example:

(a)    In granting post-conviction relief to David Gecht in May 2022, Cook County Court Judge Diana Kenworthy found "that Detective Guevara engaged in a pattern and practice of intimidating, threatening, and influencing witnesses in prior homicide investigations." Judge Kenworthy further found that "Guevara developed a pattern and practice of intimidating witnesses throughout the 1990s in order to close cases and sustain convictions," and that he "engaged in a pattern and practice of psychological abuse to obtain false testimony." In conclusion, Judge Kenworthy found that:

Overall, the cases show that Detective Guevara was motivated by a desire to close cases regardless of whether or not he had found the actual perpetrator. The cases show a pattern of Guevara first seeking voluntary cooperation, and then using manipulation, inducements, threats, and physical abuse if it was not given. This method was used to obtain false confessions and false testimony.

(b)    In ruling that Gabriel Solache and Arturo DeLeon Reyes were entitled to a new hearing to determine whether their "confessions" should have been suppressed in 2016, Cook County Circuit Court Judge James Obbish found that:

> [t]he accounts of the unrelated incidents . . . are sufficiently similar to the accounts testified to by [Solache and DeLeon-Reyes] in that they all include threats, abuse and coercion to secure statements and occurred within a range of time so as to constitute a pattern and practice . . . Altogether, these incidents include details implying that Detective Guevara would employ methods to secure a confessional or witness statement by whatever means they could.

(c)     In vacating the conviction of David Colon in 2022, Cook County Circuit Court Judge Sophia Atcherson found that:

> [i]t is now undisputed that former Detective Guevara, motivated by a desire to close cases regardless of whether he had found the actual perpetrator, engaged in multiple and repeated instances of police misconduct which took various forms . . . He had a pattern of coercing people to make false eyewitness identifications that implicated random men for murder . . .

(d)     In ruling on a petition for postconviction relief, the First District Appellate Court of Illinois wrote that:

> The State does not dispute that Detective Guevara has a history of misconduct. Nor could it. This court has recognized Detective Guevara's well-documented history of influencing and manipulating witnesses. The allegations against him span decades and share common threads. Detective Guevara is a malignant blight on the Chicago Police Department and the judicial system.
>
> *People v. Martinez*, 2021 IL App (1st) 190490, ¶ 64 (internal citations omitted).

(e)     The next year, in ruling on another petition for postconviction relief, the First District Appellate Court of Illinois observed the same:

> At the outset, we note the State does not dispute that Detective Guevara has an extensive history of misconduct, including influencing witnesses to obtain false identifications, nor could it.
>
> *People v. Robinson*, 2022 IL App (1st) 200483-U, ¶ 26; *see also People v. Gomez*, 2021 IL App (1st) 192020, ¶ 58 ("This court has recognized that Guevara has a history of influencing witnesses").

132.     The same pattern and practice described in the cases discussed above, and the same pattern and practice that has been recognized by Illinois' courts, is the same pattern and practice that was used to convict Mulero.

## COUNT I
### 42 U.S.C. § 1983 – False Confession and Fabrication of Evidence
### Due Process Clause of Fifth and Fourteenth Amendments
### Against Individual Police Officer Defendants and Supervisor Defendants

133.     Marilyn Mulero hereby incorporates by reference Paragraphs 1 through 132 as if fully set forth herein.

134.     As more fully described above, the individual Police Officer Defendants and Supervisor Defendants, acting individually, jointly, and in conspiracy, while under color of law and within the scope of their employment, deprived Mulero of her constitutional right to a fair trial in violation of the Fifth and Fourteenth Amendments.

135.     Among other things, the individual Police Officer Defendants and Supervisor Defendants, acting individually, jointly, and in conspiracy with one another: (a) coerced Mulero into giving a false confession; (b) coerced and manipulated Yvette Rodriguez into giving false statements and testimony; (c) fabricated a false statement by Rhonda Riley and coerced her into falsely identifying Mulero; (d) coerced and manipulated Jackie Serrano and Marilyn Serrano into giving false statements and testimony; and (e) coerced and manipulated Joan Roberts into giving false statements and testimony.

136.     Absent this misconduct, Mulero would not have been arrested, indicted, prosecuted, or pled guilty and would not have been convicted of this crime. At no point in time, was there any credible evidence giving rise to probable cause to suspect Mulero of murder. Thus, as a direct and proximate result of the misconduct by the individual Police Officer Defendants and Supervisor

38

Defendants, Mulero was deprived of her constitutional right to a fair trial and was ultimately convicted of a crime she did not commit.

137. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice, with reckless indifference to the rights of others, and in total disregard of the truth and Mulero's innocence.

138. The individual Police Officer Defendants and Supervisor Defendants' misconduct proximately caused Mulero to suffer injuries, including but not limited to, loss of liberty, great mental anguish, humiliation degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damages.

139. At all relevant times, the Supervisor Defendants expressly authorized and/or were aware of the individual Police Officer Defendants' misconduct and the fabricated evidence they used against Mulero. Nonetheless, the Supervisor Defendants facilitated and/or consented to the individual Police Officer Defendants' misconduct, knowing that Mulero would go to prison for a crime she did not commit.

## COUNT II
### 42 U.S.C. § 1983 – Brady Violations
### Due Process Clause of Fifth and Fourteenth Amendment
### Against Individual Police Officer Defendants and Supervisor Defendants

140. Marilyn Mulero hereby incorporates by reference Paragraphs 1 through 132 as if fully set forth herein.

141. As more fully described above, the individual Police Officer Defendants and Supervisor Defendants, acting individually, jointly, and in conspiracy, while under color of law and within the scope of their employment, deprived Plaintiff Marilyn Mulero of her constitutional right to a fair trial in violation of the Fifth and Fourteenth Amendments by withholding and suppressing exculpatory evidence from Plaintiff and the prosecution.

142.     As set forth above, the individual Police Officer Defendants and Supervisor Defendants withheld from Mulero and the prosecution exculpatory evidence including: (a) evidence of the systemic police misconduct occurring at Area Five, and specifically involving Guevara and Halvorsen, at the time of the investigation at issue; (b) that the individual Police Officer Defendants had coerced a false statement from Yvette Rodriguez; (c) that the individual Police Officer Defendants had fabricated a false statement by Rhonda Riley and coerced her into make a false identification of Mulero; (d) that the individual Police Officer Defendants had coerced false statements from Jackie Serrano and Marilyn Serrano; and (e) that the individual Police Officer Defendants coerced false statements from Joan Roberts.

143.     The misconduct described above was objectively unreasonable and was undertaken intentionally, with malice, willful indifference to Mulero's constitutional rights and in total disregard of the truth and Mulero's innocence.

144.     Through this misconduct, the individual Police Officer Defendants and Supervisor Defendants directly and proximately caused Mulero's unjust criminal conviction and wrongful imprisonment.

145.     Without the misconduct of withholding exculpatory evidence, Mulero would not have been prosecuted or convicted.

146.     By withholding exculpatory evidence from Mulero, the individual Police Officer Defendants deprived her of her constitutional right to a fair trial in violation of the Due Process Clause of the Fifth and Fourteenth Amendments to the United States Constitution.

147.     Absent this misconduct, Mulero would not have been arrested, indicted, prosecuted, or pled guilty and would not have been convicted of this crime. At no point in time, was there any credible evidence giving rise to probable cause to suspect Mulero of murder. Thus, as a direct and

proximate result of the misconduct by the individual Police Officer Defendants, Mulero was deprived of her constitutional right to a fair trial and was ultimately convicted of a crime she did not commit.

148.    The misconduct by the individual Police Officer Defendants and Supervisor Defendants proximately caused Plaintiff Mulero to suffer injuries, including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damages.

149.    At all relevant times, the Supervisor Defendants expressly authorized and/or were aware that the individual Police Officer Defendants withheld exculpatory evidence from Mulero. Nonetheless, the Supervisor Defendants facilitated and/or consented to the individual Police Officer Defendants withholding exculpatory evidence, knowing that Mulero would go to prison for a crime she did not commit.

## COUNT III
### 42 U.S.C. § 1983 – Unlawful Detention
### Fourth and Fourteenth Amendments
### Against Individual Police Officer Defendants and Supervisor Defendants

150.    Marilyn Mulero hereby incorporates by reference Paragraphs 1 through 132 as if fully set forth herein.

151.    As more fully described above, the individual Police Officer Defendants and Supervisor Defendants, acting individually, jointly, and in conspiracy, while under color of law and within the scope of their employment, accused Mulero of criminal activity and exerted influence to initiate, continue, and perpetuate her unlawful detention without any probable cause, by using evidence which they knew to be false, and in spite of the fact that they knew Mulero was innocent, in violation of her rights secured by the Fourth and Fourteenth Amendments.

152.    In so doing, the individual Police Officer Defendants and Supervisor Defendants caused Mulero to be unlawfully detained and deprived of her liberty without probable cause.

153.    Absent this misconduct, Mulero would not have been arrested, indicted, prosecuted, or pled guilty and would not have been convicted of this crime. At no point in time, was there any credible evidence giving rise to probable cause to suspect Mulero of murder. Thus, as a direct and proximate result of the misconduct by the individual Police Officer Defendants and Supervisor Defendants, Mulero was deprived of her constitutional rights to a fair trial and was detained and imprisoned without probable cause.

154.    The individual Police Officer Defendants and Supervisor Defendants' misconduct was objectively unreasonable, and the individual Police Officer Defendants and Supervisor Defendants acted intentionally and with willful indifference to Mulero's constitutional rights and innocence.

155.    The misconduct by the individual Police Officer Defendants and Supervisor Defendants directly and proximately caused Mulero to suffer injuries, including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damages.

156.    At all relevant times, the Supervisor Defendants expressly authorized and/or were aware of the individual Police Officer Defendants' misconduct in that Mulero was being detained without probable cause. Nonetheless, the Supervisor Defendants facilitated and/or consented to the individual Police Officer Defendants' misconduct, knowing that Mulero was being detained and imprisoned without probable cause.

### COUNT IV
**42 U.S.C. § 1983 – Conspiracy to Violate Constitutional Rights**
**Against Individual Police Officer Defendants and Supervisor Defendants**

157.    Marilyn Mulero hereby incorporates by reference Paragraphs 1 through 156 as if fully set forth herein.

158.    The individual Police Officer Defendants, Supervisor Defendants, and other co-conspirators, known and not yet known to Mulero, reached an agreement amongst themselves to

coerce, induce, and fabricate false evidence in the form of confessions, witness statements, and testimony for the purpose of framing Mulero for a crime she did not commit.

159. The individual Police Officer Defendants, Supervisor Defendants, other co-conspirators, known and not yet known to Mulero, reached an agreement amongst themselves to deprive Mulero of material exculpatory evidence and information to which she was lawfully entitled, and to conceal their misconduct from Mulero, all in violation of Mulero's constitutional rights as described above.

160. The individual Police Officer Defendants and Supervisor Defendants, acting in concert with known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

161. In furtherance of that conspiracy, each of the co-conspirators committed overt acts and was a willful participant in joint activity.

162. The misconduct described above was objectively unreasonable and was undertaken intentionally and with willful indifference to Mulero's constitutional rights.

163. As a direct and proximate result of this illicit agreement, Mulero suffered injuries including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damages.

## COUNT V
### 42 U.S.C. §§ 1983, 1986 – Failure to Intervene
### Against Individual Police Officer Defendants and Supervisor Defendants

164. Marilyn Mulero hereby incorporates by reference Paragraphs 1 through 163 as if fully set forth herein.

165. In the manner described above, the individual Police Officer Defendants and Supervisor Defendants stood by without intervening to prevent violations of Mulero's constitutional rights, even though they had the ability and opportunity to do so.

166.     The individual Police Officer Defendants and Supervisor Defendants' conduct was objectively unreasonable.

167.     The individual Police Officer Defendants and Supervisor Defendants acted intentionally and with willful indifference to Mulero's constitutional rights.

168.     The individual Police Officer Defendants and Supervisor Defendants, knowing of the conspiracy to frame Mulero, and having the power to prevent or aid in preventing the commission of the acts in furtherance of that conspiracy, neglected and/or refused to do so, in violation of 42 U.S.C. § 1986.

169.     As a result of the individual Police Officer Defendants and Supervisor Defendants' failures to intervene, as more fully described above, Plaintiff Marilyn Mulero suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damage.

## COUNT VI
### 42 U.S.C. § 1983 – *Monell* Claim
### Against City of Chicago

170.     Marilyn Mulero hereby incorporates by reference Paragraphs 1 through 132 as if fully set forth herein.

171.     At all material times, the individual Police Officer Defendants and Supervisor Defendants were clothed with the authority of state law and acting under color and authority of state law as agents and employees of CPD.

172.     The individual Police Officer Defendants and Supervisor Defendants committed and caused the commission of the above alleged constitutional violations pursuant to one or more *de facto* policies, practices, and/or customs of the City of Chicago.

173.     At the time of Plaintiff Marilyn Mulero's arrest, the City of Chicago had *de facto* policies or practices that included: (a) coercing confessions; (b) procuring false witness testimony from detainees and jailhouse informants; (c) concealing exculpatory evidence; (d) manipulating witnesses to

obtain false identifications from suspects and witnesses; (e) manipulating witnesses to influence their testimony; and (f) using these tactics to secure the arrest, prosecution, and conviction of a person without regard to their actual guilt or innocence.

174.    At all relevant times, there was a widespread custom and practice of: coercing false confessions; coercing, manipulating, threatening, pressuring, and offering inducements to witnesses to make false witness statements; coercing, manipulating, threatening, pressuring, and offering inducements to jailhouse informants to make false witness statements; and to conceal exculpatory evidence.

175.    At all relevant times, as set forth above, members of CPD, including but not limited to, the individual Police Officer Defendants, routinely manufactured evidence against innocent persons by coercing, manipulating, threatening, pressuring, and offering inducements to witnesses to make false statements implicating innocent persons knowing full well that those statements were false.

176.    As a matter of widespread custom and practice, members of CPD, including but not limited to the individual Police Officer Defendants in this action, fabricated narratives that were fed to vulnerable jailhouse informants who then adopted those fabricated narratives as their own for the purpose of wrongly convicting an innocent person.

177.    At all relative times, and as set forth above, members of the CPD, including but not limited to the individual Police Officer Defendants and Supervisor Defendants, routinely and systematically suppressed exculpatory and/or impeaching material by concealing evidence that witnesses were coerced, manipulated, threatened, pressured, or offered inducements to make false statements.

178.    Consistent with the *de facto* policies and practices described in the preceding paragraphs, employees of the City of Chicago, including but not limited to the individual Police Officer Defendants and Supervisor Defendants, coerced a false confession, fabricated evidence and procured

false statements from witnesses knowing full well their statements were false and would lead to the wrongful conviction of Marilyn Mulero. Moreover, the tactics and inducements used to gain cooperation from witnesses was concealed from Mulero.

179.    At all relevant times, as set forth above, members of CPD, including but not limited to the individual Police Officer Defendants and Supervisor Defendants, routinely and systematically suppressed exculpatory and/or impeaching material by intentionally concealing reports, memos, and other information in files that were maintained solely at the police department and were not disclosed to the participant of the criminal justice system. As a matter of widespread custom and practice, these files were also withheld from the State's Attorney's Office and from criminal defendants, and they were routinely destroyed at the close of the investigation, rather than being maintained as part of the official file.

180.    Consistent with the *de facto* municipal policies and practices described in the preceding paragraph, employees of the City of Chicago, including but not limited to the individual Police Officer Defendants and Supervisor Defendants, concealed exculpatory evidence from Mulero.

181.    At all relevant times, as set forth above, members of CPD, including but not limited to the individual Police Officer Defendants and Supervisor Defendants, routinely manipulated, tricked, lied to, and misled witnesses for the purpose of coercing statements and influencing their testimony to conform to narratives fabricated by the officers themselves. As a matter of widespread practice and custom, these tactics were also used to induce false identifications of suspects.

182.    Consistent with the *de facto* municipal policies and practices described in the preceding paragraph, employees of the City of Chicago, including but not limited to the individual Police Officer Defendants and Supervisor Defendants, manipulated, tricked, and improperly coerced Mulero's confession and the false statements given by Yvette Rodriguez, Rhonda Riley, Jackie Serrano, Marilyn Serrano, and Joan Roberts.

183.    At all relevant times, the City of Chicago and CPD failed to seriously discipline any CPD officers for any misconduct relating to the investigation of and/or involvement with charging innocent persons with serious crimes.

184.    Prior to and during 1992 (the year in which Marilyn Mulero was falsely charged with the murders at issue here), the City of Chicago operated a dysfunctional disciplinary system for Chicago Police Officers accused of serious misconduct. At that time, the Chicago Police Office of Professional Standards almost never imposed significant discipline against police officers accused of violating the civil and constitutional rights of members of the public. Moreover, the Chicago police disciplinary apparatus included no mechanism for identifying police officers who were repeatedly accused of engaging in the same type of misconduct.

185.    As a matter of both policy and practice, municipal policymakers and department supervisors condoned and facilitated a code of silence within CPD. In accordance with this code, officers refused to report and otherwise lied about misconduct committed by their colleagues, including the same type of misconduct at issue here.

186.    As a result of the City of Chicago's established practices and *de facto* policies of not tracking and identifying police officers who are repeatedly accused of the same kinds of serious misconduct, failing to investigate cases in which the police are implicated in a wrongful charge or conviction, failing to discipline officers accused of serious misconduct and facilitating a code of silence within the CPD. CPD officers, including, but not limited to, the individual Police Officer Defendants and Supervisor Defendants here, have come to believe that they may violate the civil rights of members of the public and cause innocent persons to be charged with serious crimes without fear of adverse consequences. As a result of these policies and practices of the City of Chicago, members of CPD act with impunity when they violate the constitutional and civil rights of citizens.

187. The City of Chicago and CPD failed in 1992 and the years prior to properly train, supervise, discipline, monitor, or otherwise control police officers engaged in police brutality and misconduct, particularly officers such as the Police Officer Defendants and Supervisor Defendants here, who were repeatedly accused of making false arrests, coercing confessions, destroying or withholding evidence, fabricating police reports, eliciting and making false statements, providing false testimony, and otherwise engaging in malicious prosecutions and wrongful convictions.

188. The need to properly train, supervise, discipline, monitor, or otherwise control police officers engaged in this type of conduct was and remains obvious.

189. By failing to properly train, supervise, discipline, monitor, or otherwise control police officers such as the Police Officer Defendants and Supervisor Defendants here, the City of Chicago and CPD effectively condoned, ratified, and sanctioned the kind of misconduct that the Police Officer Defendants and Supervisor Defendants committed against Mulero in this case.

190. The City of Chicago and CPD failed to act to remedy the patterns of abuse described above, despite actual knowledge of the pattern of misconduct, thereby perpetuating the unlawful practices and creating a *de facto* policy condoning the misconduct at issue here.

191. These *de facto* policies and practices described above were consciously approved by the City of Chicago and CPD policymakers who were deliberately indifferent to the violations of constitutional rights described herein.

192. The actions of all individual Police Officer Defendants and Supervisor Defendants were done pursuant to one or more interrelated *de facto* policies, practices, and/or customs of the City of Chicago and CPD which were ratified by policymakers for the City of Chicago and CPD with final policymaking authority. These *de facto* policies and practices include:

(a) Conducting physically and psychologically, illegal, or improperly coercive interrogations of individual to obtain false confessions, statements, and wrongful convictions;

(b) Manufacturing and fabricating false witness statements and manipulating and lying to witnesses to influence unreliable and inaccurate testimony;

(c) Covering up the true nature of witness interviews and/or interrogations;

(d) Suppressing exculpatory evidence, including but not limited to, false witness identifications and statements;

(e) Filing false police reports and giving false statements and testimony about such false reports to support false charges and wrongful convictions;

(f) Fabricating evidence to support false charges and wrongful convictions; and

(g) Lying about police misconduct during investigations of the same and to cover up the true nature of police misconduct.

193. The policies and practices described above were maintained and implemented by the City of Chicago and CPD with deliberate indifference to Mulero's constitutional rights.

194. The aforementioned *de facto* policies, practices, and/or customs of the City of Chicago and CPD were the moving force behind the individual Police Officer Defendants and Supervisor Defendants depriving Mulero of her constitutional rights.

195. These patterns and practices were so widespread, permanent, and well-settled as to constitute a custom with the force of law.

196. These patterns and practices permeate a critical mass of the institutional body of the City of Chicago and its Police Department.

197. It was obvious that these patterns and practices would lead to constitutional violations.

198. As a direct and proximate result of the City of Chicago and CPD's actions, Mulero suffered injuries including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damages for which the City of Chicago is liable.

**COUNT VII**
**State Law – Malicious Prosecution**
**Against Individual Police Officer Defendants and Supervisor Defendants**

199.     Marilyn Mulero hereby incorporates by reference paragraphs 1 through 132 as if fully set forth herein.

200.     At no point in time, was there any credible evidence giving rise to probable cause to suspect Mulero of murder.

201.     As more fully described above, the individual Police Officer Defendants and Supervisor Defendants caused Mulero to be improperly subjected to judicial proceedings for which there was no probable cause. These judicial proceedings were instituted and continued with malice and resulted in injury to Mulero.

202.     On August 9, 2022, said judicial proceedings were ultimately terminated in Mulero's favor and in a manner indicative of Mulero's innocence.

203.     The individual Police Officer Defendants and Supervisor Defendants accused Mulero of murder, knowing that she was innocent of the crime. The individual Police Officer Defendants coerced Mulero's false confession, fabricated evidence against her, manipulated witness testimony, and withheld exculpatory evidence.

204.     The individual Police Officer Defendants and Supervisor Defendants made statements to prosecutors with the intent of pressuring and exerting influence to institute and continue judicial proceedings against Mulero.

205.     The individual Police Officer Defendants and Supervisor Defendants continued the criminal proceeding against Mulero despite the absence of probable cause that she had committed a crime.

206.     This misconduct by the individual Police Officer Defendants and Supervisor Defendants was undertaken with malice, willfulness, and reckless indifference to Mulero's rights.

207.     As a direct and proximate result of this misconduct, Mulero suffered injuries, including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damage.

### COUNT IX
**Intentional Infliction of Emotional Distress**
**Against Individual Police Officer Defendants and Supervisor Defendants**

208.     Plaintiff hereby incorporates by reference paragraphs 1 through 132 as if fully set forth herein.

209.     The acts and conduct of the individual Police Officer Defendants and Supervisor Defendants as set forth above were extreme and outrageous. The individual Police Officer Defendants and Supervisor Defendants intended to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Marilyn Mulero.

210.     The individual Police Officer Defendants and Supervisor Defendants actions and conduct directly and proximately caused severe emotional distress to Mulero, and thereby constituted intentional infliction of emotional distress.

211.     The misconduct was undertaken with malice, willfulness, and reckless indifference to Mulero's rights.

212.     As a direct and proximate result of individual Police Officer Defendants and Supervisor Defendants' wrongful acts, Mulero suffered injuries, including but not limited to emotional distress.

**COUNT X**
**Willful and Wanton Conduct**
**Against Individual Police Officer Defendants and Supervisor Defendants**

213.    Marilyn Mulero hereby incorporates by reference paragraphs 1 through 132 as if fully set forth herein.

214.    At all relevant times, the individual Police Officer Defendants and Supervisor Defendants had a duty to refrain from willful and wanton conduct.

215.    Notwithstanding, the individual Police Officer Defendants and Supervisor Defendants acted willfully and wantonly through a course of conduct, as more fully described above, through a course of conduct that showed an utter indifference to, or conscious disregard of Plaintiff Marilyn Mulero's rights.

216.    As a result of the individual Police Officer Defendants and Supervisor Defendants' misconduct, as more fully described above, Plaintiff Marilyn Mulero suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damage.

**COUNT XI**
**Civil Conspiracy**
**Against Individual Police Officer Defendants and Supervisor Defendants**

217.    Marilyn Mulero hereby incorporates by reference paragraphs 1 through 132 and 199 through 216 as if fully set forth herein.

218.    As more fully described above, the individual Police Officer Defendants and Supervisor Defendants, acting in concert with one another and other co-conspirators, known and unknown, conspired to accomplish an unlawful purpose by unlawful means.

219.    In furtherance of the conspiracy, the individual Police Officer Defendants and Supervisor Defendants committed overt acts and were otherwise willing participants in joint activity.

220. The misconduct was undertaken with malice, willfulness, and reckless indifference to Plaintiff's rights.

221. As a result of this conspiracy, as more fully described above, Plaintiff Marilyn Mulero suffered loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damage.

## COUNT XII
### *Respondeat Superior*
### Against City of Chicago

222. Plaintiff hereby incorporates by reference paragraphs 1 through 221 as if fully set forth herein.

223. When they committed the acts alleged in this Complaint, the individual Police Officer Defendants and Supervisor Defendants were members and agents of the Chicago Police Department, an agency of the City of Chicago, acting at all relevant times within the scope of their employment and under color of law.

224. Defendant City of Chicago is liable as principal for all torts committed by its agents.

225. As a direct and proximate result of this misconduct, Plaintiff suffered injuries, including but not limited to, loss of liberty, great mental anguish, humiliation, degradation, physical and emotional pain and suffering, lost wages, and other continuing injuries and damage.

## COUNT XIII
### Indemnification
### Against City of Chicago

226. Plaintiff hereby incorporates by reference paragraphs 1 through 225 as if fully set forth herein.

227. Illinois law provide that public entities must pay any tort judgment for compensatory damages for which its employees are liable based upon the employees' misconduct committed within the scope of their employment activities.

228.    The individual Police Officer Defendants and Supervisor Defendants are or were employees of the Chicago Police Department, an agency of the City of Chicago, who acted within the scope of their employment in committing the misconduct described herein.

229.    Defendant City of Chicago is responsible to pay any judgment entered against the individual Police Officer Defendants.

WHEREFORE, Plaintiff Marilyn Mulero prays this Court enter judgment in her favor against Defendants Reynaldo Guevara; Geri Lynn Yanow, as Special Representative for the Estate of Ernest Halvorsen; Stephen Gawrys; Anthony Riccio; Robert Biebel; and the City of Chicago, a municipal corporation, awarding compensatory damages, costs and attorneys' fees against all Defendants, and punitive damages against each of the individual defendants in their individual capacities, and for such further and additional relief as this Court may deem appropriate and just.

## JURY DEMAND

Plaintiff demands a trial by jury in this action on each and every one of her claims.

Dated: July 24, 2023                              Respectfully Submitted,

                                                  /s/ Brian Eldridge
                                                  One of the Attorneys for Plaintiff

Steven A. Hart
Brian Eldridge
Carter Grant
John Marrese
Julie Murphy
John Chwarzynski Jr.
**HART MCLAUGHLIN & ELDRIDGE, LLC**
One South Dearborn Street, Suite 1400
Chicago, Illinois 60603
Tel: (312) 955-0545

shart@hmelegal.com
beldridge@hmelegal.com
cgrant@hmelegal.com
jmarrese@hmelegal.com
jmurphy@hmelegal.com
jwc@hmelegal.com

Antonio M. Romanucci
Bhavani Raveendran
Sam Harton
**ROMANUCCI & BLANDIN, LLC**
321 N. Clark Street, Suite 900
Chicago, Illinois 60654
Tel: (312) 458-1000
Fax: (312) 458-1004
aromanucci@rblaw.net
b.raveendran@rblaw.net
sharton@rblaw.net